FILED

2021 Mar-03  AM 09:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KELVIN SPENCER,** *et al.*, | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-CV-01023-MHH** |
| | } | |
| | } | |
| **SPECIALTY FOUNDRY** | | |
| **PRODUCTS, INC.,** *et al.*, | | |
| | | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This opinion is the second chapter of a conversation regarding the 200+ plaintiffs' effort to return their toxic tort lawsuit to Alabama state court where it began.  Imerys Minerals USA, Inc., one of 10 named defendants in this lawsuit, removed this action from state to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  (Doc. 1).  Under § 1332(d), this lawsuit qualifies as a "mass action."  A mass action is "any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs'

1

claims involve common questions of law or fact . . . ."   28 U.S.C. § 1332(d)(11)(B)(i).

Through CAFA, Congress granted federal courts subject matter jurisdiction over mass actions in which the amount in controversy exceeds $5,000,000, and there is minimal diversity, meaning at least one plaintiff and one defendant are from different states.  A federal court must exercise jurisdiction over a qualifying mass action unless "the local controversy exception or the home state exception applies," requiring remand to state court.  *Hunter v. City of Montgomery, Ala.*, 859 F.3d 1329, 1335 (11th Cir. 2017); *see also* 28 U.S.C. § 1332(d)(2), (11).  The Eleventh Circuit Court of Appeals has held that the home state exception does not apply in this case. *Spencer v. Specialty Foundry Products, Inc.*, 953 F.3d 735 (11th Cir. 2020).  That leaves the local controversy exception as the plaintiffs' final option for remand.

The plaintiffs seek remand under the first prong of CAFA's local controversy exception.  That portion of 28 U.S.C. § 1332(d)(4) states:

A district court shall decline to exercise jurisdiction under paragraph (2)-

(A)(i) over a class action in which-

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant-

(aa) from whom significant relief is sought by members of the plaintiff class;

(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons;

28 U.S.C. § 1332(d)(4)(A).[1] Congress' use of the word "and" throughout § 1332(d)(4)(A) dictates that a district court may not remand a mass action under CAFA's local controversy exception unless the action satisfies each element of § 1332(d)(4)(A). *See generally Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785 (11th Cir. 2005). The statute is demanding of plaintiffs seeking remand of a mass action "to ensure that state courts hear cases of a truly local nature," and federal courts, in all cases that are not truly local in nature, exercise the jurisdiction that Congress has conferred on them. *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1166 (11th Cir. 2006). Indeed, "CAFA's legislative history suggests that Congress

---

[1] "The local controversy exception can be satisfied in either of two ways, as provided for respectively in 28 U.S.C. § 1332(d)(4)(A) or (B)." *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1163 n.2 (11th Cir. 2006).

intended the local controversy exception to be a narrow one, with all doubts resolved 'in favor of exercising jurisdiction over the case.'" *Evans*, 449 F.3d at 1163 (quoting S. Rep. No. 109-14 at 42)).

As the parties seeking remand based on CAFA's local controversy exception, the plaintiffs bear the burden of showing that the exception applies. *Hunter*, 859 F.3d at 1335. The Court has not found guidance from the Eleventh Circuit Court of Appeals regarding the precise nature of that burden. Several courts of appeals have applied the preponderance of the evidence standard. *See, e.g.*, *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 388 (6th Cir. 2016) ("The parties and every circuit to have addressed this issue all agree that the party seeking to remand under an exception to CAFA bears the burden of establishing each element of the exception by a preponderance of the evidence."); *Vodenichar v. Halcon Energy Properties, Inc.*, 733 F.3d 497, 503 (3d Cir. 2013) ("The party seeking to invoke an exception bears the burden of proving by a preponderance of the evidence that the exception applies."); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 813-14 (5th Cir. 2007) ("Pursuant to well-settled principles of law, we hold that the party moving for remand under the CAFA exceptions to federal jurisdiction must prove the citizenship requirement by a preponderance of the evidence."). That burden is consistent with the burden that defendants in the Eleventh Circuit must carry to establish federal jurisdiction over a case removed to federal court. *Pretka v. Kolter*

*City Plaza II, Inc.*, 608 F.3d 744, 755 (11th Cir. 2010). Accordingly, the plaintiffs must establish by a preponderance of the evidence that the local controversy exception applies.

In *Evans*, because the plaintiffs "adduced little or no evidence" to "satisfy two requirements for the local controversy exception," the Eleventh Circuit did not "address the kind or quantity of evidence that should be required" of a plaintiff to establish CAFA's local controversy exception. *Evans*, 449 F.3d at 1168 n.8. The Eleventh Circuit noted:

> The local controversy exception will require evidence about the composition of the plaintiff class. The plaintiffs have defined the class and have better access to information about the scope and composition of that class. With respect to the "significant defendant" prong, both plaintiffs and defendants have access to relevant information. Defendants have better access to information about conduct by the defendants, but plaintiffs have better access to information about which plaintiffs are injured and their relationship to various defendants.

449 F.3d at 1164 n.3. The Eleventh Circuit has held that "defendants may submit a wide range of evidence in order to satisfy the jurisdictional requirements of removal." *Pretka*, 608 F.3d at 755. The Court believes that the Eleventh Circuit would apply the same standard to plaintiffs seeking remand under an exception to CAFA. *See Vodenichar*, 733 F.3d at 503 n.1 ("Courts may consider pleadings as well as evidence that the parties submit to determine whether subject matter jurisdiction exists or an exception thereto applies.").

The plaintiffs have proved by a preponderance of the evidence the elements of the local controversy exception in § 1332(d)(4)(A)(i)(1), § 1332(d)(4)(A)(i)(III), and § 1332(d)(4)(A)(ii).  Through affidavits from plaintiffs' counsel, the plaintiffs have established that more than two-thirds of them are Alabama citizens, that the plaintiffs incurred their injuries at the Grede foundry in Bessemer, Alabama where the plaintiffs worked, and that "no other class action or mass action has been filed by the plaintiffs or other persons asserting the same or similar factual allegations against any of the defendants as are asserted on behalf of the plaintiffs in this case." (Doc. 29-3, p. 1, ¶ 4; Doc. 50-2).[2]  Therefore, the local controversy exception will apply in this case if the plaintiffs can establish by a preponderance of the evidence that at least one of the defendants is an Alabama citizen, is a defendant from whom the plaintiffs seek "significant relief," and is a defendant "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class."  28 U.S.C. § 1332(d)(4)(A)(i)(II).

_____

[2] In his affidavit, Kent McCain, one of the plaintiffs' attorneys, explained that he "examined our clients' files that contain information that was provided directly by the client and/or through verified phone calls from our office to the clients." (Doc. 50-2, p. 1, ¶ 3).  "Each client confirmed that the address given was their permanent home in which they physically currently reside and is the place they intend to remain." (Doc. 50-2, p. 1, ¶ 3).  Mr. McCain filed under seal a list of the addresses of all 229 plaintiffs.  (Doc. 50-2, pp. 5-10).  Of the 229 plaintiffs, 228 are permanent residents of Alabama, and 207 are permanent residents of Jefferson County, Alabama.  (Doc. 50-2, p. 1, ¶ 3).

In *Evans*, the Eleventh Circuit explained that the party invoking the local controversy exception must show that the relief the plaintiff seeks from a local defendant is "a significant portion of the entire relief sought by the class." *Evans*, 449 F.3d at 1167 (citing *Robinson v. Cheetah Transp.*, No. 06-0005, 2006 WL 468820 (W.D. La. Feb. 27, 2006), and *Kearns v. Ford Motor Co.*, No. 05-5644, 2005 WL 3967998 (C.D. Cal. Nov. 21, 2005)).   "[W]hether a putative class seeks significant relief from an in-state defendant includes not only an assessment of how many members of the class were harmed by the defendant's actions, but also a comparison of the relief sought between all defendants and each defendant's ability to pay a potential judgment." *Evans*, 449 F.3d at 1167 (quoting *Robinson*, 2006 WL 468820, at *3).

The plaintiffs identify defendant Specialty Foundry Products, Inc. as an Alabama citizen from which they seek significant relief.  (Doc. 29, p. 1).  It is undisputed that Specialty is an Alabama corporation, so it is an Alabama citizen. (Doc. 18, p. 1 (Specialty's answer); Doc. 29-4, p. 1).[3]

---

[3] In their complaint, the plaintiffs named a second Alabama citizen as a defendant.  The plaintiffs allege that Southern Precision Sand, Inc. is an Alabama corporation.  (Doc. 1-1, p. 8).  In its answer, Southern Precision Sand asserts that "SPS was an Alabama corporation that was doing business until October 28, 2008 and was formally dissolved on December 22, 2014."  (Doc. 64, p. 1).

Specialty is the first of 10 named defendants in the plaintiffs' state court complaint. (Doc. 1-2, p. 3).[4] The plaintiffs allege that as "former workers in the Grede Foundry located in Bessemer, Alabama," they were exposed to toxic chemicals released through the defendants' products when Grede used those products "in foundry processes" to produce "foundry casted metal parts and related moulding, coring, and finishing processes." (Doc. 1-1, pp. 7, 12, 13, ¶¶ 1, 18, 19). The plaintiffs contend they were exposed to the following toxic substances: "formaldehyde, isocyanates, diethanolamine, trimethylamine, triethanolamine, nitrites, nitrates, nitrosamines, benzene, PCBs, PAHs, and dimethylisopropylamine, among others." (Doc. 1-1, p. 17, ¶ 32).

The plaintiffs allege that Specialty Foundry Products and Porter Warner Industries manufactured and distributed foundry chemical products and foundry and core room sand. (Doc. 1-1, p. 7, ¶¶ 2-3). They allege that the following named defendants manufactured and distributed specialized shell core sand that contained chemical additives and other types of chemically treated sand used throughout the foundry: Southern Precision Sand, Hill & Griffith Company, and Imerys Minerals

_____

[4] In their state court complaint, the plaintiffs also named fictitious defendants. (Doc. 1-1, pp. 3-6). The Court dismissed without prejudice the claims against defendant Fairmount-Santrol, Inc. pursuant to a joint stipulation of *pro tanto* dismissal. (Doc. 63). The nine remaining defendants are Specialty Foundry Products, Inc.; Porter Warner Industries, LLC; Southern Precision Sand, Inc.; Hill & Griffith Company; Imerys Minerals USA, Inc.; Alpha Resins, LLC; Wedron Silica Company.; Ashland Oil, Inc; and Ask Chemicals LP.

USA.  (Doc. 1-1, p. 8, ¶¶ 4-6).  The plaintiffs allege that Alpha Resins, Wedron Silica, and Fairmount Santrol manufactured, marketed, distributed, and sold chemical resins, binders, setting catalysts, and chemically treated foundry sand pre-mix products used in the foundry.  (Doc. 1-1, pp. 8-9, ¶ 7).  And the plaintiffs allege that Ashland Oil and ASK Chemicals manufactured, marketed, distributed, and sold foundry chemicals, including triethylamine liquid and/or gas known as "T-gas" and a release agent called "Zip Slip."  (Doc. 1-1, p. 9, ¶ 8).[5]

The plaintiffs allege that they have suffered physical injuries, adverse medical symptoms, mental anguish and emotional distress, and aggravation of pre-existing conditions.  (Doc. 1-1, p. 18, ¶ 35).  According to the plaintiffs, the defendants provided unsafe directions for use of their respective products, communicated unsafe exposure level information, and attempted to conceal such dangers by using "anti-warning" language that minimized the appearance of health risks.  (Doc. 1-1, pp. 16-17, ¶¶ 28, 30(a)).  The plaintiffs have asserted against each defendant a claim under the Alabama Extended Manufacturers Liability Doctrine and Alabama state law

---

[5] The Plaintiffs also allege that fictitious defendants manufactured, distributed and supplied chemically treated foundry or core sand pre-mix products, chemical resins, binders, setting catalysts, release agents, biocides, fungicides, coolant water chemical additives, metal working fluids, formaldehyde, isocyanates, diethanolamine, triethylamine, triethanolamine, nitrites, nitrates, nitrosamines, benzine, PCBs, PAHs, dimethylisopropylamine and other hazardous or carcinogenic chemicals, and crystalline silica.  (Doc. 1-1, pp. 9-12, ¶¶ 9-16).

claims for wantonness, failure to warn, negligence, conspiracy, and fraudulent misrepresentation, suppression and deceit.  (Doc. 1-1, pp. 19-31, ¶¶ 38-88).

Specialty acknowledges that it distributed specialized foundry chemicals and core sand to the Grede Foundry, and it "distributed products of other named Defendants to Grede Foundry." (Doc. 18, pp. 1-2, 10).  Specialty also acknowledges that it was aware of applicable OSHA requirements and other regulatory obligations relating to the Grede Foundry.  (Doc. 18, p. 6).

In affidavits, several plaintiffs have explained Specialty's role at the foundry. The affiants state that the foundry used some chemicals in high volume, and Specialty supplied three-quarters of those high-volume chemicals.  (Doc. 29-2, pp. 1-2, ¶¶ 7-9).  The high-volume chemicals "were both present in the core room and the foundry areas of the plant and were pervasive throughout the work environment. For this reason, all employees would have been exposed to these chemicals and sand." (Doc. 50-1, p. 1, ¶ 5).

According to Tommy Starks, a 30-year Grede employee who was "personally involved in obtaining and using the chemicals needed to run the operation[s]" at the foundry, Grede "purchased and received chemicals from Specialty much more often than any other chemical supplier."  (Doc. 92-1, p. 1, ¶¶ 3-4).  Grede bought chemicals from Specialty for 16 years, "a longer timespan than the other

defendants," which gave Specialty "knowledge of [Grede's] operations to make [Specialty] a valuable chemical supplier, compared to the other defendants." (Doc. 92-1, p. 2, ¶ 9). Grede bought chemicals from Specialty "in very large quantities, on hundreds of occasions, making [Specialty] Grede's most important defendant chemical supplier." (Doc. 92-1, p. 2, ¶ 12). The chemicals Grede received from Specialty and other manufacturers "were used and mixed together" in the manufacturing process. (Doc. 92-1, p. 1, ¶ 5).

According to Johnny Henderson, a 40-year Grede employee, Grede was unlike the other manufacturers from which Grede bought chemicals because Specialty "advised us on how to use the chemicals in our operation." (Doc. 92-2, p. 1, ¶ 4). Specialty advised Grede about "how to use the chemicals from other chemical suppliers. This really made Specialty . . . a turn-key supplier, where they could help [Grede] with almost anything . . . related to the chemicals and manufacturing operations, unlike any other defendant." (Doc. 92-2, p. 3, ¶ 15).[6] Matthew Brown, a Safety and Health Manager for Grede, confirmed that a Specialty "representative came by Grede approximately once a month and provided

_____

[6] In their complaint, the plaintiffs allege that Porter Warner Industries also "advised, consulted, and made recommendations regarding use of such specialized foundry products at the . . . Grede Foundry." (Doc. 1-1, p. 7, ¶ 3(c)). This allegation is identical to the allegation in the preceding paragraph against Specialty. (*See* Doc. 1-1, p. 7, ¶ 2(c)). If the evidence bears this allegation out, then Specialty may not be the only defendant who did more than simply deliver products to the foundry.

knowledge and advice about how to use their products in the foundry." (Doc. 50-1, p. 2). Mr. Brown and other Grede employees "relied on the advice and recommendations made by the Specialty Foundry representatives from both a technical and safety standpoint." (Doc. 50-1, p. 2).

Mr. Henderson explained that Specialty supplied PX-10, a release agent used in "great quantities" at Grede. (Doc. 92-2, p. 2, ¶ 11) (*see also* Doc. 92-2, p. 8). PX-10 was one of Grede's "primary chemicals." (Doc. 92-2, p. 2, ¶ 9).

Several former Grede employees have stated that the foundry would not have been able to run without the chemicals that Specialty provided. (Doc. 29-2, p. 3, ¶¶ 19; Doc. 29-5, p. 2, ¶ 6; Doc. 92-1, p. 2, ¶ 11). Specialty's location a few miles from the foundry made Specialty the natural go-to for chemicals that the foundry required. (Doc. 92-1, p. 2, ¶ 10; Doc. 92-2, p. 2, ¶ 12).

Given the evidence that Grede mixed chemicals from the various defendants in its manufacturing process, it likely will be difficult for the plaintiffs to pinpoint a specific chemical from a specific manufacturer or distributor that caused the plaintiffs purported toxic exposure and injuries. But the evidence establishes that unlike the other manufacturers and distributors which the plaintiffs have sued, Specialty delivered substantially more product to Grede over a longer period of time than the other defendants, and, more importantly, Specialty did more than simply

deliver chemicals to Grede.  Specialty advised Grede about how to use the chemicals in its operations.  Unlike the plaintiffs in *Evans*, the *Spencer* plaintiffs have offered evidence to demonstrate that Specialty "played a significant role in the alleged contamination, as opposed to a lesser role, or even a minimal role." *Evans*, 449 F.3d at 1167.

Still, the plaintiffs have offered no evidence that enables the Court to assess the ability of Specialty to pay an award of damages or the extent to which the plaintiffs hope to recover damages from Specialty as compared to the other named defendants.  With respect to ability to pay, as a local defendant, Specialty may have fewer resources than some of the other defendants.  At oral argument, the plaintiffs speculated that Specialty probably has insurance to cover a damages award.  But there is no evidence to support that statement and no evidence that the other defendants do not have insurance also.

Alabama law adds a wrinkle to an assessment of the relief the plaintiffs seek from the defendants.  Under Alabama law, even if Specialty were to prove to be more culpable than the other defendants, "[d]amages are not apportioned among joint tort-feasors in Alabama; instead, joint tort-feasors are jointly and severally liable for the entire amount of damages awarded." *Matkin v. Smith*, 643 So. 2d 949, 951 (Ala. 1994) (citing *Buchanan v. Collier*, 555 So. 2d 134 (Ala. 1989)).  As the Eleventh Circuit noted in *Evans*, joint and several liability may mean that the

plaintiffs may seek relief from Specialty for the conduct of other defendants, *Evans*,

449 F.3d at 1167 n.7, but the reverse is true as well.  The Court need not unwind that

knot because the plaintiffs have not established by a preponderance of the evidence

that Specialty is able to pay the bulk of a damages award in this action.[7]

Because the plaintiffs have not carried their burden of proving that Specialty

is a significant defendant under 28 U.S.C. § 1332(d)(4)(A), the Court must exercise

jurisdiction over this action under CAFA.  Therefore, the Court denies the plaintiffs'

motion to remand.

**DONE** and **ORDERED** this March 3, 2021.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

_____

[7] Alabama law also may limit Specialty's liability to the extent that Specialty distributed other manufacturers' products.  *See* ALA. CODE § 6-5-521.  Section 6-5-521 is designed to "protect distributors who are merely conduits of a product" while preserving claims against distributors for "independent acts unrelated to the product design or manufacture, such as independent acts of negligence, wantonness, warranty violations, or fraud."  ALA. CODE § 6-5-521(b)(4).  Caleb Herndon, a 20-year Specialty employee, submitted an affidavit in which he states that Specialty did not manufacture the chemicals or products identified in the plaintiffs' complaint.  (Doc. 42-1, p. 3, ¶ 6a).  He asserts that Specialty "did not have substantial control over the design, testing, manufacture, packaging or labeling of those products" and "did not alter or modify" them.  (Doc. 42-1, p. 3, ¶ 6b-c).  According to Mr. Herndon, Specialty "obtained the products it distributed to Grede Foundry straight from the manufacturer or from another distributor and simply distributed those products to Grede in the condition the products were distributed to Specialty Products."  (Doc. 42-1, p. 3, ¶ 7).  If Mr. Herndon's assertions ultimately are uncontradicted, then, under Alabama law, Specialty's liability to the plaintiffs would seem to have to rest on "independent acts unrelated to the product design or manufacture, such as independent acts of negligence, wantonness, warranty violations, or fraud."

14